# THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL L. MARASIGAN,<br>JOSE ARTHUR "ART" D. CHAN, JR., and<br>CHRISTINE C. CHAN,<br><br>Defendants. | CRIMINAL CASE NO. 23-00014<br><br>**DECISION AND ORDER DENYING DEFENDANT MICHAEL L. MARASIGAN'S MOTION IN LIMINE FOR MISTRIAL (ECF NO. 409)** |

This matter comes before the court upon Defendant Michael L. Marasigan's Motion in Limine for Mistrial Resulting from Violation of Defendant's Right to a Public Trial.[1] ECF No. 409. The court has reviewed the record, the parties' briefs, and the relevant law and has determined that this matter is suitable for submission without oral argument or an evidentiary hearing.[2] For the reasons previously stated on the record and for the reasons provided below, Defendant Marasigan's Motion is **DENIED**.

---

[1] Although the Motion is titled "Motion in Limine," it is not a motion in limine. Instead, the court will construe the Motion as a motion for mistrial. Counsels are reminded that motions before the court should be properly captioned and supported by citations to the applicable law and legal standards under which they are brought.

[2] On March 12, 2025, the court allowed the parties to argue their positions on the court's decision and counsel for Defendant Marasigan stated his objection and moved to reduce the number of jurors in the courtroom. *See* Mins., ECF No. 374; s*ee also* Mot. at 2, ECF No. 409. The court overruled the objection at that time. *See* Mins., ECF No. 374. Nonetheless, Defendant Marasigan's counsel has raised the issue again in the instant Motion.

## I. Background[3]

The District Court of Guam has two courtrooms, one of which is on the fourth floor of the courthouse. The fourth-floor courtroom, which was used for voir dire and is still being used for the trial in this case, has a maximum capacity of ninety-eight people.[4] During jury selection, the court seats the veniremen in the jury box (eighteen seats), in chairs set up outside the jury box (thirteen seats), and in the benches located in the back of the courtroom (forty-nine seats). The seating chart used by the court during jury selection demonstrates this arrangement.[5]



There are seven defendants in this case, three of which have proceeded to trial[6], and the underlying charges against all defendants involve bingo games, which are a popular pastime in Guam. As such, the defendants and many of the witnesses are well known in the community. Given this context, the court summoned approximately 300 jurors for voir dire. This pool was

---

[3] Page citations throughout this Decision and Order refer to the page numbers generated by the CM/ECF system.

[4] The second courtroom is on the third floor with a lesser capacity of approximately seventy people.

[5] The highlighted portion (seats seventy-two through eighty) represents the seats made available to the public at 10:52 a.m. *See infra* at 5, 8-9.

[6] Three defendants have pleaded guilty, and one defendant passed away. *See* ECF Nos. 80, 87, 160, 209.

2

reduced to a group of 160 potential jurors by the start of jury selection after responses to the summonses were collected and excuses were accounted for. The court then split this pool into two groups of eighty to accommodate the courtroom's maximum capacity under the fire code. The first group was called in on March 13, 2025, and the second group was scheduled for March 14, 2025, if the jury had not been selected from the first group. *See* Mins., ECF No. 366. The court informed the parties of this arrangement at the pretrial conference on March 11, 2025, and further informed them that it would set up a temporary viewing space in the public waiting area immediately adjacent to the courtroom until seating becomes available in the courtroom. *See id.*

At the continued pretrial conference on March 12, 2025, the court issued a formal ruling on the record, explaining that the court "[is] not closing the courtroom to the public" but is instead "ordering that the public waiting room be converted into a temporary viewing space for the public during the voir dire proceeding only at this point." Tr. at 4:23-5:3, ECF No. 424; *see also* Mins., ECF No. 374. And "[a]s soon as space becomes available in the courtroom, the individuals in the overflow room will be informed to move into the courtroom." Tr. at 6:11-6:16, ECF No. 424. The purpose of this decision was to ensure that "all the necessary individuals for the trial are safely seated in the courtroom. These individuals include the court staff that need to man the trial, the prosecutor and her agent or staff, the three defendants plus their attorneys and staff members and the 160-plus potential jurors." *Id.* at 5:4-5:9. The court further explained that "it cannot even accommodate the 160 potential jurors in one seating" because "the courtroom has a maximum capacity of 98 individuals under the fire code," and "[t]o exceed such capacity would be to endanger everyone's safety in the courtroom in the event of a fire and in an emergency evacuation." *Id.* at 5:10-6:3. The court went on to state that "[r]educing the number of jurors to even less than 80 per day to accommodate reserve seatings for the public in the courtroom would only mean prolonging the voir dire process and further burdening the 160-plus

jurors who are waiting for their turn and would have to call in every day to find out whether they are required to come in the next day or not." *Id.* at 5:18-5:23.

The court considered alternatives, such as "further splitting the jury pool into subdivision and conducting multiple sessions of voir dire" and "moving part of the jury into the 3rd floor [court]room and connecting the courtrooms via Zoom," and found that its course of action is "the most reasonable in comparison to the other alternatives" because it "considers the size of the courtroom, the courtroom's maximum capacity under the fire code, the number of potential jurors and the temporariness of the situation." *Id.* at 7:8-8:7. The alternatives would "make[] the process extremely inefficient by unnecessarily prolonging the voir dire and . . . further burden[] the potential jurors, as well as unnecessarily expend[] judicial resources," and it "would prevent you, the parties and the attorneys, [from] being present in the [third floor] courtroom with all jurors during voir dire." *Id.* The court concluded that "setting up a temporary overflow room for public viewing is a narrowly[ ]tailored alternative that balances the defendants' Sixth Amendment right to a public trial with the interest in judicial efficiency and, most importantly, the safety of those in the courtroom." *Id.* at 8:8-8:13.

Finally, speaking on the practical implications for the public, the court stated that "if there isn't any room [after the jurors are seated], the non-jurors would go to the room right next door. And as soon as we have challenges for cause that take place or other excuses that occur, then those jurors will be able to be seated and we'll have to make sure that we accommodate in such a way that the jurors are all in one place and then the public is in a different place." *Id.* at 8:16-8:23. Following the court's order, Mr. Phillips requested that the court remove four jurors from the courtroom to seat two members from the public and two members of the media. *Id.* at 8:25-9:8. The court denied this request for the reasons previously explained. *Id.* at 12:15-12:20.

On March 13, 2025, the court conducted a continued pretrial conference, beginning at

9:37 a.m., before calling in the jurors for voir dire at 10:13 a.m. and beginning voir dire at 10:18 a.m. *See* Mins., ECF No. 377. Even before this, the court's information technology ("IT") staff had set up and tested the temporary viewing space as ordered by the court.[7] The screen was set up to livestream voir dire, visualizing the camera angles as arranged by the courtroom deputy and the sounds picked up by the courtroom microphones.[8] Throughout voir dire, the court and all parties spoke into their microphones, and whenever potential jurors explained their answers to the questioning, court staff provided them with a microphone. After about thirty minutes, around 10:52 a.m., the court ordered that its staff consolidate the remaining veniremen to free up a row of seating in the back of the courtroom for any members of the public seated in the temporary viewing area. After the seating arrangement was shifted, the court had its staff inform anyone in the temporary viewing area that seating was available before resuming voir dire. One member of the public entered the courtroom at 10:54 a.m.[9] After that person entered the courtroom, the court was informed by its staff that no other members of the public were seated outside. The court preserved the temporary viewing space as set up by its IT staff until the lunch recess, which began at 12:08 p.m. *See* Mins., ECF No. 377. A jury was empaneled at the end of the day on March 13, 2025, and public seating in the courtroom had been available since 10:54 a.m. that morning.

### A. The Parties' Arguments

Defendant Marasigan begins his Motion by reminding the court of his objection to the court's decision on the chosen setup for voir dire. *See* Mot. at 2, ECF No. 409. The Motion

---

[7] The IT staff continued to monitor the set up and physically checked on the video and audio feed in the temporary viewing space at 10:43 a.m. to ensure that everything was working properly.

[8] The same camera angles are also displayed on all the screens in the courtroom, including the two large screens in the courtroom gallery, the smaller screens on counsels' tables, and the smaller screens in the jury box.

[9] This person was later identified as Defendant Marasigan's spouse, Winston Manabat-Marasigan. *See* Decl., ECF No. 445.

proceeds to provide a series of block quotations from cases and law journal articles that explain how the Sixth Amendment right to a public trail includes voir dire and that purport to support his argument that the court must grant a mistrial. *See id.* at 2-12. Substantively, Defendant Marasigan argues that the court failed to sufficiently articulate the reasons for its order and that the circumstances did not warrant the court's decision. *See id.* at 6-8, 9-10, 12-13. Defendant Marasigan then attached a decision "[a]ttributable to Attorney Lujan" from the Superior Court of Guam in support of his arguments. *See id.* at 13-19. Defendant Christine C. Chan joined this Motion. *See* Joinder, ECF No. 420.

The Government opposed the Motion, explaining that "the Defendant's trial has been open to the public. The lack of seating for those interested in viewing the jury selection did not act as a closure of the trial. The public was able to observe the proceedings, since the Court set up the fourth-floor public seating area as a temporary viewing space with live-streamed video of the jury selection process." Opp'n at 2, ECF No. 434. In response, Defendant Marasigan's Reply re-emphasizes his argument that the court's order was insufficient.[10] *See* Reply, ECF No. 436. On April 3, 2025, Defendant Marasigan further supplemented his Motion with an "Offer of Proof" that appends the Declaration of Winston Manabat-Marasigan.[11] *See* Decl., ECF No. 445.

## II.  Legal Standard

A mistrial should only be granted when "'taking all the circumstances into consideration, there is a manifest necessity' for doing so." *Renico v. Lett*, 559 U.S. 766, 773-74 (2010) (quoting *Arizona v. Washington*, 434 U.S. 497, 506 (1978)); *see also* FED. R. CRIM. P. 26.3 (providing the proper procedure before granting a mistrial). "Manifest necessity" is to be interpreted as

---

[10] As with Defendant Marasigan's initial motion, the reply lacks any meaningful analysis and it is littered with block quotations and supplemented by a forty-page excerpt of an article titled *Trial without Jury in Guam, USA*. *See* Reply, ECF No. 436.

[11] As the court will discuss further below, the declaration largely misrepresents the facts as they occurred. At the time of this Decision and Order, the court has orally reminded counsels for Defendant Marasigan to not misrepresent the record on several occasions.

6

requiring "a high degree of necessity," and such determination is within the broad discretion of the trial judge. *Washington*, 434 U.S. at 774 (internal quotations omitted); *see also United States v. Bates*, 917 F.2d 388, 394 (9th Cir. 1990).

The Sixth Amendment enshrines the right to a public trial. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ."). Although paramount, this right is not absolute. *See United States v. Ivester*, 316 F.3d 955, 959 (9th Cir. 2003); *see also Waller v. Georgia*, 467 U.S. 39, 45-46 (1984). In fact, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Waller*, 467 U.S. at 45. In such cases, the interest "is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.*

Nonetheless, a defendant's right to a public trial is only implicated by a "closure," i.e., where the trial court makes "some affirmative act . . . meant to exclude persons from the courtroom." *United States v. Shryock*, 342 F.3d 948, 974 (9th Cir. 2003) (quoting *United States v. Al Smadi*, 15 F.3d 153, 155 (10th Cir. 1994) and citing *Ivester*, 316 F.3d at 958)). And "in some circumstances, exclusion of members of the public from a judicial proceeding does not implicate the constitutional guarantee." *United States v. Mikhel*, 889 F.3d 1003, 1033 (9th Cir. 2018) (quoting *United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012)) (holding that "the size of the courtroom [does] not amount to a 'closure,' and therefore [does] not implicate Appellant's Sixth Amendment right to a public trial"); *see also Ivester*, 316 F.3d at 959-60 (holding that some closures, such as mid-trial questioning of jurors about their safety, are too trivial to implicate the Sixth Amendment right to a public trial). "To determine whether a closure implicates the Sixth Amendment, we look to whether the closure affected the values

7

undergirding the right to a public trial, including ensuring fair proceedings, reminding the prosecutor and judge of their grave responsibilities, discouraging perjury, and encouraging witness to come forward." *Id.* (citing *Rivera*, 682 F.3d at 1033).

### III. Analysis

As an initial matter, the court does not find that its arrangement of jurors during jury selection amounted to a closure and, therefore, does not implicate the defendants' constitutional guarantee. The court took no "affirmative act" to exclude persons from the courtroom. *See Shryock*, 342 F.3d at 974. As the court explained to the parties prior to jury selection, it did not order that the courtroom be closed or that the voir dire proceedings be closed to the public. *E.g.*, Tr. at 4:23-5:1, ECF No. 424. Rather, the seating of jurors in the courtroom during jury selection necessarily resulted in a situation where available seating was filled by veniremen, and the court could not exceed the courtroom's maximum capacity under the fire code. *Cf. Mikhel*, 889 F.3d at 1033. To remedy the situation, the court's IT staff set up a temporary viewing area to accommodate any members of the public who were unable to be seated in the courtroom until seating became available in the courtroom gallery. *See* Tr. at 5:1-5:9, ECF No. 424. The values "undergirding the right to a public trial" were not affected by the decision to seat the jurors in this way or to set up a temporary viewing area. *See id.* Defendant Marasigan does not assert, and the court does not find, that there was a negative effect on the values undergirding the right to a public trial. *Id.*; *see also Ivester*, 316 F.3d at 959-60. In fact, such a finding would be contrary to the record.

On the day of jury selection, proceedings outside the presence of the venire began at 9:37 a.m. The jurors were not called into the courtroom until 10:13 a.m., and before the court did so, it noted that there are no members of the public currently in the courtroom. The case was called at 10:18 a.m., at which time the jurors were seated in the courtroom, and the court began voir dire.

8

At 10:52 a.m., after excusing several jurors for cause, the court instructed its staff to help shift the jurors' seating arrangements to free up a row of seats for any members of the public seated in the temporary viewing space.[12] At that time, the court noted that there was only one member of the public waiting in the temporary viewing space. That individual, as noted above, was Mr. Manabat-Marasigan. At 10:54 a.m., Mr. Manabat-Marasigan found a seat in the courtroom (around seat numbers seventy-nine and eighty) and the court proceeded with jury selection. Since that time, the courtroom maintained available seating for members of the public throughout the trial.[13]

There is no evidence to support the conclusion that the approximately thirty-minute period of voir dire where seats were not available to members of the public in the courtroom and a temporary public viewing space was set up affected the values "undergirding the right to a public trial." *See Mikhel*, 889 F.3d at 1033; *Ivester*, 316 F.3d at 959-60. Such a trivial period during which all available seats were taken by veniremen does not support the "manifest necessity" to declare a mistrial, and such relief shall not be granted. *See Bates*, 917 F.2d at 394.

Assuming *arguendo* that the court "closed" the courtroom during jury selection—which it did not—the court further finds that the presumption of openness is overcome by the interests expressed on the record: to ensure the safety of those in the courtroom and in the interests of judicial efficiency. Tr. at 6:11-6:16, 8:8-8:13; ECF No. 424; *cf. Waller*, 467 U.S. at 45. These

---

[12] The court made seats seventy-two through eighty available for any members of the public seated in the temporary viewing space. *See* courtroom diagram *supra* at 2.

[13] These findings are contrary to the factual assertions made in the Declaration of Winston Manabat-Marasigan. To confirm this determination, the court viewed the security camera footage of the courtroom, the hallway outside the courtroom, and the public waiting area. For example, Mr. Manabat-Marasigan states that he "attempted to enter the courtroom" "[a]t around 8:30 a.m.," even though the pretrial conference with the parties did not begin until 9:37 a.m. *and* voir dire did not begin until 10:18 a.m. *See* Decl. at 4, ECF No. 445. Further statements made in the Declaration, including the timing of Mr. Manabat-Marasigan's standing at the back of the courtroom while the jurors were re-randomized at the request of Defendant Marasigan and the timing of when he was accompanied by attorney Darlene Hiton, are contradicted by the court's review of the security camera footage. The court has serious concerns about these factual misrepresentations by the declarant given that such Declaration was made under penalty of perjury. Given the factual misrepresentations contained therein, the court will strike the Declaration in its entirety.

interests, when coupled with the court's order to set up a temporary viewing space—which was only used for approximately the first thirty-six minutes of jury selection—provided a narrowly tailored alternative to further that interest. *Id.* Moreover, the court considered the circumstances surrounding its order and alternatives thereto, such as using the third-floor courtroom and further splitting the venire into additional pools, and for the reasons stated on the record, found such alternatives unworkable. *See* Tr. at 6:17-8:8, ECF No. 424. The factual findings made on the record, supplemented by the record developed herein, support the conclusion that even if the court's order constituted a "closure," such order does not implicate the defendants' Sixth Amendment rights. Accordingly, Defendant Marasigan's Motion is denied.

## IV. Conclusion

For the reasons explained above, the court finds that Defendant Marasigan's Sixth Amendment right to a public trial was not implicated by the court's order. Therefore, Defendant Marasigan's Motion in Limine for Mistrial is **DENIED**.

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: May 09, 2025**